**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2003-DP-02281-SCT**

*FRED SANFORD SPICER, JR. a/k/a FREDDIE SPICER, JR.*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 05/1/2003 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| COURT FROM WHICH APPEALED: | GEORGE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ANDRE DE GRUY |
| | SIDNEY AMON BARNETT |
| | DARRYL A. HURT |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MELANIE KATHRYN DOTSON |
| | JUDY T. MARTIN |
| DISTRICT ATTORNEY: | KEITH MILLER |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 01/05/2006 |
| MOTION FOR REHEARING FILED: | 01/19/2006; DENIED AND MODIFIED AT ¶18 - 03/02/2006 |
| MANDATE ISSUED: | |


**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     On April 30, 2003, a George County jury found Fred Sanford Spicer, Jr., guilty of capital murder.  After a sentencing hearing, the jury determined that Spicer should be given the death penalty, and the trial court entered judgment sentencing him to death by lethal injection.  Spicer

filed a Motion for New Trial, or in the Alternative J.N.O.V., which the trial court denied. He now appeals to this Court and raises the following issues:

1. Denial of his state and federal constitutional and statutory rights because he was brought before the jury in shackles and the trial court denied his timely motion for mistrial.

2. Improper admission of evidence of flight from authorities.

3. Improper admission of prejudicial evidence of character of the decedent in the State's case in chief.

4. Failure to suppress evidence seized in violation of the state and federal constitutions.

5. Insufficiency of evidence to prove guilt of capital murder.

6. Denial of a lesser-included offense instruction.

7. Jury instruction S-8[1] relieved the State of the burden of proving intent to commit the underlying felony, thereby violating the federal and state constitutions.

8. Allowing the prosecution's "send a message" argument in the guilt phase.

9. Failure of the indictment to charge aggravating circumstances and a mens rea standard.

10. Removal, for cause, of jurors qualified to serve under constitutional standards.

11. Prosecutorial misconduct in closing argument of the sentencing phase

12. Allowing the jury to consider the aggravators of robbery and pecuniary gain.

13. Admission of irrelevant and prejudicial photographs of the accused.

14. Cumulative error sufficient to require reversal of the conviction and death sentence.

¶2. Finding that Spicer's assertions of error have no merit, we affirm.

---

[1] As will be explained in Issue VII infra, the challenged instruction was inadvertently referred to as S-7A by both parties, but the record clearly reflects that S-8 was the subject of this assertion of error.

2

# FACTS

¶3. In late September, 2001, Edmond Hebert invited Fred Spicer to live with him in his trailer located at 170 Pinewood Drive, Lucedale, Mississippi. At the same time, Hebert helped Spicer obtain employment with the roofing company for which Hebert worked. On the night of October 11, 2001, Hebert and Spicer left work and drove to Woody's Outpost in Jackson County, Mississippi, where they bought beer, and then proceeded to the home of Larry Beauchamp, where they spent several hours drinking and socializing. While at Beauchamp's home, Hebert mentioned that he was in violation of his parole from Louisiana and that he might have to return there to finish his prison sentence. Hebert then asked Beauchamp to take care of his dog if he ever had to return to Louisiana. When Spicer heard Hebert's request, he told Hebert that he wanted the dog if Hebert had to return to Louisiana. Hebert replied that he had already given the responsibility to Beauchamp. According to Beauchamp, Spicer's attitude and demeanor changed when Hebert refused to give Spicer responsibility of the dog. Hebert and Spicer left Beauchamp's home after several hours and Beauchamp was the last known person besides Spicer to see Hebert alive.

¶4. On October 12, 2001, Hebert's mother, Patricia Elder, received a phone call from the employer of Hebert and Spicer, stating that the two had been fired for not showing up for work. Elder lived next to Hebert's trailer, and she went over to tell Hebert of the phone call she received. When she saw that Hebert's green Nissan truck was not there, she returned to her home.[2] She came by Hebert's trailer a second time after she returned from a trip into town, but

---

[2]Elder testified that according to past experience, if Hebert's truck was not at the trailer, he was not at home.

Hebert's truck was still not there. A third check by Mr. and Mrs. Elder later in the day again revealed that Hebert's truck was not there.

¶5. Around the time Elder first began searching for Hebert, Deputy Sergeant Brian White of the Jackson County Sheriff's Department noticed a man driving a green Nissan truck in an unusual manner. Traveling northbound on Market Street in Jackson County in a marked vehicle, Sergeant White stopped at the intersection with Highway 90. Traveling southbound on Market Street, the green Nissan stopped at the same intersection and proceeded to make a left-turn onto Highway 90. Sergeant White testified:

> I noticed a green Nissan pickup truck facing me with a white male, white female occupant. The driver just, immediately when I pulled up, put a cold stare, what I call a cold stare on me. He just made eye contact with me and did not break eye contact with me.

Sergeant White then stated:

> The green Nissan pickup truck began to make a left-hand turn onto Highway 90, at which time the driver never broke eye contact with me. As the driver began to make his left-hand turn, his stare continued in my direction, and as the vehicle began its left-hand turn, he just turned his head along with it, keeping a stare on me. And the white female passenger put her hand over her face and tried to squat down in the seat to avoid contact with me.

After Sergeant White turned right onto Highway 90 behind the green Nissan truck, he noticed the female passenger still squatting down in the passenger side of the vehicle and the driver still staring at Sergeant White through the rear-view mirror.

¶6. Due to the suspicious actions of the Nissan's passengers, Sergeant White began to follow the truck in the far left lane and called in the license plate number to the Jackson County Sheriff's Department for a background check. Suddenly, the Nissan crossed three lanes of traffic without using a turn signal and turned right into the parking lot of the China Garden

4

Restaurant. Sergeant White was unable to change lanes safely due to the flow of traffic and thus proceeded to the nearest turnaround and pulled into a parking lot where he waited to see if the Nissan would drive by. A few seconds later, the Nissan truck drove by, traveling in the same direction as before. Sergeant White decided to pull the truck over, but before he could reenter Highway 90, the truck suddenly turned right into a motel parking lot. As Sergeant White turned onto the motel premises, he observed the driver and the female passenger exit the truck and attempt to hide.[3] After a brief search of the parking lot, Sergeant White was able to detain the driver, who, when commanded to display his hands, threw the keys of the Nissan truck to the side.

¶7. Despite questioning from Sergeant White, the driver refused to identify himself and had no identification on his person. Sergeant White found the keys that the driver discarded and asked the driver whether the keys belonged to him. The driver responded by saying, "What keys?" When the dispatcher informed Sergeant White that the license plate identified that car as registered to Edmond Hebert, Sergeant White asked the driver whether he was Hebert. The driver responded by saying, "I don't know who you are talking about."

¶8. While Sergeant White was attempting to question the unknown driver, Lieutenant Krebs of the Jackson County Sheriff's Department came to the scene and stayed with the driver while Sergeant White attempted to locate the female passenger. He found the passenger hiding behind

---

[3]Sergeant White testified that "the female was in somewhat of a quick walk to a jog, running away from the vehicle, and the male was ducking behind some bricks that were close to the parked vehicle."

a garbage can on the top floor of the hotel and determined her name to be Angel Hinger.[4] Hinger identified the unknown driver as Freddie Spicer and that Spicer had told her that "he did not need to be caught in [the] pickup truck."[5]

¶9. When Sergeant White returned to where he left Krebs with Spicer, Krebbs said that Spicer had revealed his first name to be Freddie. Sergeant White decided to detain Spicer and have the truck held until a positive identification could be made of Spicer.[6] Before the truck was towed, White conducted an inventory search in the presence of Spicer pursuant to Jackson County Sheriff's Department procedures. Through the inventory search, the officers discovered paperwork stating that Edmond Hebert was the registered owner of the vehicle, and also discovered a sword in plain view on the front seat and a camouflage jacket and drugs in the truck's toolbox.

¶10. After completing the inventory search, White transported Spicer to the Jackson County Adult Detention Center. During transport, Spicer told Sergeant White his date of birth and social security number. With this information, they determined that the driver of the Nissan

---

[4]Pascagoula police identified Hinger as a prostitute and local narcotics user. According to Hinger, she and Spicer smoked crack cocaine together and partied the night before Spicer's arrest.

[5]The information about Hinger's identification of Spicer and his fear of being caught in the truck comes from the testimony of Sergeant White while the jury was removed from the courtroom. The jury was removed for part of Sergeant White's testimony while the trial judge conducted a hearing on Spicer's Motion to Suppress evidence gathered from a search of the Nissan truck. Later in the trial, Michael Jones , a witness for the State who had ridden earlier in the day with Spicer, testified that Spicer told him he had to avoid law enforcement officials while driving "because [this] truck is stolen." Jones was a convicted felon.

[6]It is not clear from Sergeant White's testimony when Spicer was arrested.
At points in his testimony Sergeant White said he "detained" Spicer. However, Sergeant White does not use the term "arrest" in his testimony.

truck was indeed Freddie Spicer and that he was wanted by police in Franklin, Massachusetts, for burglary. Once Spicer was positively identified, Sergeant White issued Spicer three traffic citations for improper lane usage, driving with no driver's license, and resisting arrest by fleeing. At the detention center, Spicer continued to deny knowing who the truck belonged to or that the keys he threw away matched the truck.

¶11. The George County Sheriff's Department was contacted and requested to check on Edmond Hebert's welfare. George County Deputy Sheriff John Hilburn drove through the neighborhood where Hebert's trailer was located, but he could not find the actual address. He then approached James Elder, Hebert's stepfather who happened to be outside, and asked Elder if he knew Hebert. When James Elder identified himself as Hebert's stepfather, the two proceeded to Hebert's trailer. The trailer was locked, and they received no answer to their knocks on the door and windows. Elder then forced the door open and found Hebert's body dead on a couch, covered with blood from facial and head wounds. There were also blood spatters on the trailer walls, ceiling, floor, lampshades, and a table.

¶12. An autopsy revealed that Hebert at or near the time of death suffered a "large abraded laceration . . . measuring approximately three and one-half inches in length and across the forehead in a diagonal manner." The edges of the laceration were "actually scraped" and there was "fractures [to] the skull itself." Dr. Steven Hayne, who performed the autopsy, testified that the injury to the forehead was fatal due to the "fractures of the skull, both the cranial vault or the skull cap, the base of the skull, bleeding between the brain and the skull, bruising of the

7

brain, and actually tearing of the brain . . . ."[7]  Hebert also suffered from extensive bleeding around both eyes and had an abrasion of the skin covering his nose.  In addition, autopsy results revealed that Hebert suffered from traumatic injuries to his upper back as well as bruises, abrasions, and broken bones involving his right hand.  Doctor Hayne  testified that all Hebert's injuries were consistent with a person trying to defend himself and that Hebert's death was a homicide.

¶13.  During the investigation into Hebert's death, law enforcement officials determined that a large sword, previously mounted on Hebert's wall, was missing, and was found in Hebert's Nissan truck when Spicer was apprehended.  Subsequent testing of blood stains on the sword revealed the genetic profile to be that of Hebert.  The green camouflage jacket found in the truck's toolbox as well as the cargo pants and T-shirt worn by Spicer at the time of his detention also tested positive for blood that matched Hebert's genetic profile.

## ANALYSIS

¶14.  This Court will review an appeal from a capital murder conviction and death sentence with "heightened scrutiny" under which all bona fide doubts are resolved in favor of the accused.  *Simmons v. State*, 805 So. 2d 452, 472 (Miss. 2001).  Furthermore, this Court is cognizant of the fact that what may be harmless error in certain situations becomes reversible error where the penalty is death.  *Id.*

    **I.**       **Shackling of Spicer**

---

[7]Dr. Hayne testified that to a reasonable degree of medical certainty Hebert's injuries were consistent with the effects that could be produced by a blow from the blunt edge of the sword found in Hebert's truck.

8

¶15. Before voir dire and while the potential jurors were seated in the courtroom, Spicer, dressed in civilian clothes, was led into the courtroom with his hands and feet shackled. Mississippi Department of Corrections Officer Theresa Ball led him into the courtroom through the back door behind the court bench and they proceeded approximately three to six feet to the witness room, where she removed the shackles.[8] Ball was following Mississippi Department of Corrections policy that all prisoners (misdemeanor and felony) be restrained during transport. The trial judge estimated that Spicer was in view of the potential jurors for only a few seconds. Spicer's counsel moved for a mistrial arguing that the potential jury members were prejudiced as a result of possibly seeing Spicer shackled and that Spicer could not receive a fair trial. However, Spicer presented no evidence that any of the jurors noticed the shackling. The trial judge denied Spicer's motion, finding that "this particular display was inadvertent" and "momentary."

¶16. Spicer argues that "[i]t is a common-law right of a person being tried for the commission of a crime to be free from all manner of shackles or bonds, whether of hands or feet, when in court in the presence of the jury, unless in exceptional cases where there is a realistic danger of his escape or in order to protect others from attack by [the] prisoner." *Rush v. State*, 301 So. 2d 297, 300 (Miss. 1974). Spicer is correct in his assertion that a defendant should be restrained in the courtroom only where there is a danger of the defendant escaping or being a danger to others. However, this Court also stated that "the failure, through an oversight, to remove handcuffs from a prisoner for a short time or any technical violation of the rule

---

[8]Officer Ball had brought Spicer into the courthouse and courtroom through the back areas of the courthouse that were not used by the public.

9

prohibiting shackling, not prejudicial to him, is not ground for reversal." *Id.* This Court has held in several cases that a relatively brief view of the prisoner in shackles or prison clothing by the jury is not grounds for reversal unless prejudice is demonstrated. *See*, *e.g.*, *Payton v. State*, 897 So. 2d 921, 931-33 (Miss. 2003) (defendant brought into court restrained for several minutes in presence of jury pool until trial judge granted defendant a conference); *Davenport v. State*, 662 So. 2d 629, 632-33 (Miss. 1995) (defendant allegedly observed shackled during transport outside the courtroom); *Wiley v. State*, 582 So. 2d 1008, 1013-14 (Miss. 1991) (defendant observed shackled while in hallway outside courtroom before sheriff removed shackles); *Coleman v. State*, 378 So. 2d 640, 645 (Miss. 1979) (juror observed defendant in prison clothing while passing open doorway).

¶17.    Spicer also asserts that the United States Supreme Court's most recent pronouncement on shackling of defendants, *Deck v. Missouri*, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005), reinforces his argument that he was entitled to a mistrial because he was brought into the courtroom in shackles when there were prospective jurors present in the courtroom. In our view, *Deck* is clearly distinguishable from the present case. Moreover, it lends support and reinforces this Court's precedent regarding shackling of defendants. From the first day of the proceeding to the last, Deck was shackled with leg irons, handcuffs, and a belly chain. In the present case, Spicer was transported to the courthouse in full shackles, but they were removed when he was placed in the witness room, before any of the court proceedings had begun.

¶18.    [I]n *Deck* the Court stated in its opening statement:

> We here consider whether shackling a convicted offender *during* the penalty phase of a capital case violates the Federal Constitution. We hold that the Constitution forbids the use of visible shackles *during* the penalty phase, as it

10

forbids their use *during* the guilt phase, unless that use is "justified by an essential state interest . . . . "

*Id* at 2009. (internal citations omitted; emphasis added). The Court, in its preface to the first consideration, states:

> We first consider whether, as a general matter, the Constitution permits a State to use visible shackles routinely in the guilt phase of a criminal trial. The answer is clear: The law has long forbidden routine use of visible shackles *during* the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need.

*Id* at 2010 (emphasis added). In reviewing the history of shackling, the Court then states:

> Courts and commentators share close to a consensus that, *during* the guilt phase of a trial, a criminal defendant has a right to remain free of physical restraints that are visible to the jury; that the right has a constitutional dimension; but that the right may be overcome in a particular instance by essential state interests such as physical security, escape prevention, or courtroom decorum.

*Id.* at 2012 (internal citations omitted; emphasis added). The Court concludes its review in *Deck* with a brief reference to *Holbrook v. Flynn*, 475 U.S. 560, 568, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986), in which it first stated that shackling is "inherently prejudicial." In *Holbrook*, as in myriad other precedents from federal and state courts, the defendant was shackled throughout the entire proceeding.

¶19.    In the present case, potential jurors possibly observed Spicer shackled in his brief walk of approximately six feet, from the back entrance of the courtroom to the witness room. That would not require a mistrial. "This Court has routinely upheld the trial court's refusal to grant a mistrial even in cases where the record affirmatively shows that jurors actually saw the defendant in restraints." *Payton*, 897 So. 2d at 932-33. After a thorough review we find that this is the position taken by the majority of our sister jurisdictions throughout the country. *See*

11

*e.g., **Hamrick v. People,*** 624 P.2d 1320, 1322 (Colo. 1981); ***Rhodes v. State***, 264 Ga. 123, 123, 441 S.E.2d 748, 748 (1994); ***Miles v. State***, 365 Md. 488, 537, 781 A.2d 787, 836 (2001). We hold that the momentary, inadvertent and fleeting sight of a prisoner in shackles by potential jurors, while that prisoner is being transported into the courtroom, absent prejudice shown, does not require a mistrial. We find that Spicer's first assertion is without merit.

## II.    Evidence of Flight

¶20.    Spicer asserts that the trial court committed reversible error in admitting testimony regarding his fleeing from Sergeant White while driving along Highway 90.    Before trial, the court heard arguments in limine regarding numerous issues.    Spicer's counsel argued that, he had reason to flee because he was in possession of illegal drugs and also there was a warrant for his arrest in Franklin, Massachusetts, for burglary. The State indicated that it wanted to present testimony from Angel Hinger, the passenger in the stolen vehicle driven by Spicer, to explain why they acted as they did upon seeing Sergeant White. That testimony would include the fact that they had partied together for a number of hours, and had drugs in the car at the time. Spicer's counsel objected, stating "it is beyond the res gestae of this case, and seeks to do nothing but inflame and prejudice the jury."    The State agreed that it was beyond the res gestae, but argued further the importance of explaining to the jury why White followed Spicer and Hinger in the first place.[9]    At the conclusion of that hearing, the trial judge reserved ruling on the motion, and cautioned the State not to elicit "that information directly" without warning the

---

[9] The prosecutor explained the essence of what would be in White's testimony, regarding Spicer's unusual behavior and erratic driving, and defense counsel again stated that ". . . it's beyond the res gestae of the case." The court responded "I understand where you are coming from , Mr. Hurt, and what your objection is. But I have some  reservations about the relevancy of that information . . .."

trial court first, to which defense counsel commented "I just fail to see what [sic] partying hours after the crime would go to the motive." The State, following the court's instructions, presented no evidence or testimony before the jury of Spicer's potential drug use and possession, but did present the remainder of the explanatory testimony through Sergeant White. No objection was made by Spicer.

¶21. Spicer now argues that he had independent reasons for fleeing from law enforcement officials that were known by the trial court and could not be explained to the jury due to their prejudicial effects, and thus any testimony of Sergeant White's pursuit of him was reversible error. Spicer relies upon *Fuselier v. State*, 702 So. 2d 388, 390 (Miss. 1997), in which this Court said "[e]vidence of flight is inadmissible where there is an independent reason for flight known by the court which cannot be explained to the jury because of its prejudicial effect upon the defendant." Spicer's reliance is misplaced, however, because the facts of that case, as well as the context in which testimony regarding the flight was admitted, are entirely different from the present case. In *Fuselier*, two days after the murder for which he was accused, Fuselier jumped out of a back window of a friend's home when law enforcement officers arrived there. *Id.* at 390. He ran toward the woods, and the officers chased and apprehended him. *Id.* This Court held that Fusilier was prejudiced because the testimony regarding his flight was indicative of guilty knowledge. *Id.* at 391-92. In the present case, the evidence of Spicer's erratic driving and his attempt to evade Sergeant White was not admitted for the purpose of proving consciousness of guilt. Rather, it was admitted as part of the narrative explaining why and how Sergeant White began to follow Spicer, and the events which led to the lawful search of the

13

stolen vehicle in which the murder weapon was found. The jury was given no instruction regarding flight, nor was one requested.

¶22. Because Spicer did not object to testimony giving evidence of his fleeing from law enforcement officials, he is procedurally barred from appealing the issue. Failure to make a contemporaneous objection waives an issue for purposes of appeal. *Williams v. State*, 684 So. 2d 1179, 1203 (Miss. 1996) (contemporaneous objection rule is applicable in death penalty cases). Spicer claims that he made an objection: however, it is clear that the objection which he made merely challenged Sergeant White's testimony on the basis that the events to which he was testifying were beyond the res gestae of the charged crime. An objection at trial on one or more specific grounds constitutes a waiver of all other grounds. *Doss v. State*, 709 So. 2d 369, 379 (Miss. 1996).

¶23. Notwithstanding the procedural bar, Spicer's assertion of error is without merit. The evidence of Spicer's flight from law enforcement officials was not admitted for the purpose of proving consciousness of guilt. Instead, it was admitted as part of a narrative explaining to the jurors the events which transpired prior to Spicer's arrest. In addition to Sergeant White's testimony, Angel Hinger testified to the events which happened while she was riding with Spicer as well as after he was detained by the officers. There was also testimony from Chubby Jones, who had been a passenger with Spicer shortly before law enforcement officials apprehended him, that Spicer admitted that the truck was stolen. No objection was made to that testimony. The proscription set forth in *Fuselier*, that evidence of flight is not admissible if "there is an independent reason for flight known by the court which cannot be explained to the jury because

14

of its prejudicial effect upon the defendant" simply does not apply in the present context. We find that Spicer's second assertion of error is without merit.

### III. Evidence of Character of the Decedent

¶24. Spicer argues that "[t]he prosecutor presented irrelevant and highly prejudicial evidence of Hebert's character in its case in chief and then argued extensively that this evidence was reason to convict."[10] In support of his argument, Spicer directs this Court's attention to two sections of testimony by Patricia Elder, Hebert's mother, as well as part of the State's closing argument during the guilt phase of the trial. Each incident alleged by Spicer will be considered accordingly.

#### A. *Admission of Hebert's photograph*

¶25. First, without objection by Spicer, the trial court admitted into evidence a photograph[11] of Hebert during Patricia Elder's testimony. Spicer argues that the State's purpose in seeking admission of the photograph was to evoke the sympathy of the jury and accordingly such evidence is not admissible, *See **Eckman v. Moore***, 876 So. 2d 975, 985 (Miss. 2004). However, Spicer failed to object to the admission of the photograph at issue and is therefore

---

[10]Spicer mistakenly labels the testimony and evidence he is objecting to as "character evidence." "Character evidence" is "evidence offered solely to prove a person acted in conformity with a trait of character on a given occasion." McCormick on Evidence 649 (John W. Strong ed., West Group 5th ed. 1999); *see* Miss. R. Evid. 404(a). The admitted evidence to which Spicer objects was not used to prove Hebert acted in conformity with a trait of character on a given occasion. Spicer appears to be objecting to evidence he believes could have caused the jury to base its verdict "on vengeance and sympathy as opposed to reasoned application of rules of law to the facts . . .." ***Fuselier v. State***, 468 So. 2d 45, 53 (Miss. 1985).

[11]The photograph in question showed Hebert smiling at the camera while at his computer in his trailer.

barred from raising the issue on appeal. *Williams v. State*, 684 So. 2d 1179, 1203 (Miss. 1996) (contemporaneous objection rule is applicable in death penalty cases).

¶26. Notwithstanding the procedural bar, this Court finds that the admission of the photograph into evidence was not error. The trial judge has discretion to determine whether or not photographs have a legitimate evidentiary purpose. *Walker v. State*, 671 So. 2d 581, 601 (Miss. 1996). In *Walker*, the defendant objected on appeal to the admission of a photograph taken of the deceased before her death. *Id.* at 600. The photograph at issue in *Walker* was shown to witnesses for identification purposes. *Id.* at 601. The defendant objected, arguing that the photograph "was irrelevant and was used purely to evoke the sympathy of the jury." *Id.* at 600. This Court held the photograph to be properly admitted and stated, as a general rule, the fact that a photograph of the deceased in a homicide case might arouse the emotions of jurors does not itself render it incompetent in evidence so long as introduction of the photograph serves some legitimate evidentiary purpose. *Id*. at 601 (quoting *May v. State*, 199 So. 2d 635, 640 (Miss. 1967)). In the present case, the State sought admission of the picture of Hebert for identification purposes. Since the trial court admitted the photograph of Hebert for a legitimate evidentiary purpose and there was nothing otherwise prejudicial about the picture itself, we find that Spicer's assertion that the trial court erred in the admission of the photograph is without merit.

B. *Testimony of Hebert's mother*

¶27. Spicer next asserts that Patricia Elder's testimony regarding her interactions with Hebert elicited on cross-examination during the guilt phase was inadmissible due to the potential to

evoke sympathy from the jury. *Eckman,* 876 So. 2d at 985. The following dialogue occurred on cross-examination:

> Q. Okay. How often did you visit there [Hebert's trailer]?
>
> A. I didn't visit a lot at my son's, because he came to my house every morning for coffee–
>
> Q. Great.
>
> A. –and in the evening to bathe, shower. So, I didn't go to his trailer often.
>
> Q. But he would come and visit with you[?]
>
> A. He would be with me. I was very sick and he would visit me.

¶28. Regarding Patricia Elder's testimony, Spicer waived any alleged error because he invited Patricia Elder's testimony by his cross-examination questions. "A defendant cannot complain on appeal of alleged errors invited or induced by himself." *Caston v. State*, 823 So. 2d 473, 502 (Miss. 2002) (quoting *Singleton v. State*, 518 So. 2d 653, 655 (Miss. 1988)). Spicer is also barred from raising the issue on appeal because he did not make any contemporaneous objection to Patricia Elder's testimony. Failure to make a contemporaneous objection waives an issue for purposes of appeal. *Williams*, 684 So. 2d at 1203 (contemporaneous objection rule is applicable in death penalty cases).

¶29. Alternatively, this Court holds that Patricia Elder's testimony was admissible. In *Scott v. State*, 878 So. 2d 933, 963-64 (Miss. 2004), this Court held that similar guilt phase testimony concerning the background and habitual actions of the victim was not "victim impact" testimony, but instead was admissible to explain the circumstances surrounding the crime and establish guilt. Patricia Elder's testimony was relevant background information that helped the jury

understand the relationship between Patricia Elder and Hebert and the family's actions on the day law enforcement officials discovered Hebert's body. We find that Spicer's assertion regarding the admission of Patricia Elder's testimony is procedurally barred and alternatively without merit.

### C.    The State's closing argument

¶30.    Spicer next asserts that the State presented irrelevant and highly prejudicial character evidence in its closing argument, when the prosecutor stated:

> But before we talk about the things that go forward, let's talk about the one player in the case that was not here today. Mr. Hebert. Let's think about Mr. Hebert. He was a fellow resident of George County. He obviously worked with his hands. Some of you disdain that. I think that it's something to be proud of, that somebody can do something with their hands. I think the foundation of this country was built by people that did things with their hands, not people with flannel mouths like me. I think this country was built by hard-working young men like him that were willing to do work, and I think he was the type of person that you would have been proud to have as a neighbor.
>
> You may look at his residence and it may not be as nice as your residence. It was a trailer, it had a front porch that wasn't even complete. But this was a young man that was building his life. He didn't have the advantages that some people have. He didn't have Mamma and Daddy wealthy. He didn't have Mamma and Daddy say: Let me build a house for you. He had to do it all on his own.
>
> He was a little man, he was five five, about 150 pounds, and he did, apparently, all types of carpentry work, roofing work, anything that involved manual labor with his hands. The interesting thing about the jury instruction regarding the element is, it doesn't say he must be a prominent member of your community. It doesn't say he has to be a wealthy person. It doesn't say anything other than he was a human being. And he very much was a human being. This young man, by the photo, would tell me that he enjoyed computers. But when you look into that picture, that was a living human being. Just like yourselves.
>
> And as a matter of fact, who would of thunk it? Because, you see, not only was he a human being, but he might be better than most of the people in this whole room as far as goodness is concerned. And why is that? It's because the testimony clearly shows that Mr. Hebert considered Mr. Spicer down on his luck. How many of us would take someone in, even if we knew they were down on their luck? Get out of here. Get out of here. I'll find some church to take care of you. Get out of here. Most of the people in this room would do that. Most of the people in this room didn't have the goodness in their heart that Mr. Hebert did.

18

Not only did he take the man into his lodging, into his trailer, but obviously got him a job. Obviously was letting him live at the trailer, go to work with him, and come back. Now, so far, everything I've heard sounds like this is a man with goodness in his heart.

He drinks beer. I hope lighting [sic] doesn't strike everybody here that drinks beer. I might be the first to go down. You might not like alcohol, you might think it's a sin, but let me tell you a fact of life. Lots of good people drink beer. On that night, clearly, he had consumed beer. Why not? He had just been paid. Why not celebrate hard work? You see, ladies and gentlemen, a lot of us don't understand that when people that work with their hands get through a paid week, maybe they like to celebrate a little more. Maybe they like to drink a beer. Does that make them a bad person? Or does that make them the type of person who might not be able to go to Destin, Florida on a vacation, who might not be able to go to Europe on a vacation, who might not be able to go to Disney World on a vacation. Have this little bitty celebration of drinking beer.

Have you heard anything yet that tells you, even an inkling, that Mr. Hebert wasn't a good human being? Is there anything here that you've heard that makes him less of a human being, less of a person than anyone in this room?

That's right. He didn't have the home that you may have. He may not have had the advantages that some of you have had, too. Including myself.

¶31. The purpose of a closing argument is to fairly sum up the evidence. *Rogers v. State*, 796 So. 2d 1022, 1027 (Miss. 2001). The prosecutor should point out those facts presented by the State on which the prosecution contends a verdict of guilty would be proper. *Clemons v. State*, 320 So. 2d 368, 371 (Miss. 1975). This Court stated in *Bell v. State*:

> An impassioned argument is not in itself an improper argument. Furthermore, the prosecutor, as any other counsel, is free to recall and comment on testimony offered in evidence and to draw inferences. [The prosecutor] may comment upon any facts introduced into evidence. He may draw whatever deductions seem to him proper from these facts, so long as he does not use violent and abusive language, and even in many cases invectives may be justified and even called for, as pointed out by Chief Justice Whitfield in *Gray v. State*, 90 Miss. 235, 43 So. 289 (1907).

725 So. 2d 836, 851 (Miss. 1998). Attorneys are afforded wide latitude in arguing their cases to the jury, but they are not allowed to employ tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury. *Sheppard v. State*, 777 So. 2d 659, 661

(Miss. 2001). The standard of review which this Court must apply to lawyer misconduct during closing arguments is "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Id.* The trial judge is in the best position to determine if an alleged objectionable remark has a prejudicial effect. *Roundtree v. State*, 568 So. 2d 1173, 1177 (Miss. 1990). Furthermore, "[g]iven the latitude afforded an attorney during closing argument, any allegedly improper prosecutorial comment must be considered in context, considering the circumstances of the case, when deciding on their propriety." *Ahmad v. State,* 603 So. 2d 843, 846 (Miss. 1992).

¶32. Spicer did not object to the State's comments during its closing argument and is thus procedurally barred from appealing the issue. Failure to make a contemporaneous objection waives an issue for purposes of appeal. *Williams*, 684 So. 2d at 1203 (contemporaneous objection rule is applicable in death penalty cases).

¶33. Spicer's assertion of error is without merit. The prosecutor's comments were not character evidence. In the context of the present case, the prosecutor summarized testimony regarding Hebert's personal background. "[T]he very purpose of an advocate is to help the jury draw conclusions from the evidence and to make suggestions as to a proper conclusion." *Evans v. State*, 725 So. 2d 613, 671 (Miss. 1997) (quoting *Peyton v. State,* 286 So. 2d 817, 819 (Miss. 1973)). We find that Spicer's third assertion of error is without merit.

### IV. Vehicle Search

¶34. Spicer argues that the trial court erred by failing to exclude from evidence the sword seized from Hebert's Nissan truck. According to Spicer, law enforcement officials obtained the

20

sword through an illegal search of the truck that exceeded the scope of a search allowed incident to arrest.[12]  Therefore, the fruit of the search incident to Spicer's arrest violated his Fourth Amendment right to be free from an illegal search and seizure.  *See **Wong Sun v. United States***, 371 U.S. 471, 485-86, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441 (1963).  The State responds by arguing that the search of Hebert's truck was a permissible inventory search, conducted pursuant to Jackson County Sheriff's Department procedures.[13]  Spicer argues that the search was not an inventory search since the only item listed on the impound inventory was brass knuckles.

¶35.  Spicer waived any alleged error by the trial court because he failed to object to the admission of the sword into evidence.  The State offered the sword into evidence during the testimony of Patricia Elder without objection.  Seven witnesses later,[14] Spicer objected to the

---

[12]In a search of an automobile incident to arrest, law enforcement officials can contemporaneous with arrest search the passenger compartment of an automobile in order to remove weapons the arrestee might seek and to prevent an arrestee from concealing or destroying evidence. ***N.Y. v. Belton***, 453 U.S. 454, 457-60, 101 S. Ct. 2860, 2862-64, 69 L. Ed. 2d 768 (1981).  Spicer claims that the search was conducted at the scene after law enforcement officials detained Spicer and the officers' safety was secured.

[13]In order for an inventory search of an automobile to be lawful, the automobile must be lawfully in police custody, the inventory must be conducted pursuant to standard, routine police procedures, and that there must be no suggestion that the standard procedures are a pretext concealing an investigatory police motive. ***S.D. v. Opperman***, 428 U.S. 364, 372-76, 96 S. Ct. 3092, 3098-3100, 49 L. Ed. 2d 1000 (1976).

[14]One of the witnesses who testified after Patricia Elder, but before Sergeant White, was Dr. Hayne, the person who performed Hebert's autopsy.  Dr. Hayne testified that Hebert's injuries were consistent with the effect that could be produced by a blow from the blunt edge of the sword found in Hebert's truck.

21

sword during the testimony of Sergeant White, about the search of the truck driven by Spicer.[15]

Failure to make a contemporaneous objection waives an issue for purposes of appeal. ***Williams***,

684 So. 2d at 1203 (contemporaneous objection rule is applicable in death penalty cases).

¶36.    Additionally, Spicer cannot claim the trial court erred by failing to exclude the sword

from the evidence because he has no standing to make a Fourth Amendment claim.    The Fourth

Amendment states:

> The right of the people to be secure in *their* persons, houses, papers, and effects,
> against unreasonable searches and seizures, shall not be violated, and no Warrants
> shall issue, but upon probable cause, supported by Oath   or affirmation, and
> particularly describing the place to be searched, and     the persons or things to be
> seized.

U.S. Const. amend. IV (emphasis added).    "Fourth Amendment rights are personal rights which,

like some other constitutional rights, may not be vicariously asserted." ***Alderman v. United***

***States***, 394 U.S. 165, 174, 89 S. Ct. 961, 966-67, 22 L. Ed. 2d 176 (1969).  In ***Walker v. State***,

this Court said "Richardson, not Walker, was the owner of the car.   Only persons whose Fourth

Amendment rights have been violated can benefit from the protections of the exclusionary rule."

913 So.2d 198, 225(Miss. 2005).   Here, Hebert, not Spicer, was the owner of the truck. We find

that Spicer has no standing to assert the sword was the product of an illegal search, and his fourth

assignment of error is without merit.

### V.    Sufficiency of the Evidence

---

[15] Sergeant White searched Hebert's car after detaining Spicer and deciding to impound the truck until a positive identification of Spicer could be made and the identify of the owner determined.  During the search, Sergeant White discovered registration papers stating Hebert to be the owner of the truck.

22

¶37.    At the close of the evidence, Spicer moved the trial judge for a directed verdict, arguing that the State had presented legally insufficient evidence to prove Spicer guilty of capital murder. The trial judge denied Spicer's motion, and Spicer now argues that the trial judge's denial was erroneous.

¶38.    When reviewing the legal sufficiency of the evidence, this Court's standard of review is as follows:

> [This Court] must, with respect to each element of the offense, consider all of the evidence–not just the evidence which supports the case for the prosecution–in the light most favorable to the verdict.  The credible evidence which is consistent with the guilt must be accepted as true.    The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence.  Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury.  [This Court] may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.

*Franklin v. State,* 676 So. 2d 287, 288 (Miss. 1996).  Spicer argues that there was not legally sufficient evidence to support a conviction of the underlying felony of robbery.  A capital murder conviction under Miss. Code Ann. § 97-3-19(2)(e)[16] must be supported by evidence legally sufficient to support a conviction of both the murder and the underlying felony, had either been charged alone.  *Fisher v. State*, 481 So. 2d 203, 212 (Miss. 1985).  Spicer claims that the only

---

[16]Miss. Code Ann. § 97-3-19(2)(e) states:

(2)The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:

(e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnaping, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies.

23

evidence to support a robbery conviction was the mere possession of Hebert's Nissan truck,[17] and the testimony of Michael Jones, a convicted felon.[18] According to Spicer, there was no evidence to suggest Spicer had an intent to rob Hebert prior to Hebert's death. Spicer cites no Mississippi case law to support his argument.

¶39. Spicer's argument is not persuasive. In *Knox v. State*, the defendant argued that the prosecution failed to prove he intended to rob the murder victim. 805 So. 2d 527, 531 (Miss. 2002). Knox claimed that the prosecution presented no direct evidence as to when and under what circumstances he came into the possession of the murder victim's keys. *Id.* Therefore, according to Knox, the jury could not have determined beyond a reasonable doubt that Knox had committed an underlying robbery. *Id.* This Court rejected Knox's argument, stating:

> Fully considering the crime in question, the location of [the murder victim's body] in the trunk of her car, and the keys to that car in Knox's possession even after he changed his clothes, it is clearly a question for the jury whether [the murder victim] was robbed or whether it was Knox's intent to rob her.

*Id.* Later in the opinion, this Court reiterated:

> [W]hen the defendant is discovered with the personal property of the deceased on his person it is entirely within reason for the jury to find that this fact in itself constitutes robbery. It is also within the jury's province to conclude that Knox killed [the murder victim] intending to take her car and that he either failed to do so or intended to return at a later time.

---

[17]As part of his defense, Spicer elicited testimony from Jerry Woodward, the owner of a convenience store in Jackson County which Spicer and Hebert frequented, stating that he had observed at times previous to the murder Spicer driving Hebert's truck alone. Spicer was attempting to prove Hebert allowed Spicer to borrow the truck and thus Spicer had permission to drive the truck the day he was caught in Jackson County.

[18]Jones rode with Spicer in Hebert's truck before Spicer picked up Hinger. Jones testified that Spicer told him "the truck is stolen."

24

*Id.* at 532.

¶40. The present case is analogous to ***Knox***. Law enforcement officials discovered Spicer in possession of Hebert's truck and a sword taken from Hebert's trailer. Following the holding of ***Knox***, possession of a deceased's property creates a reasonable inference that the property was stolen. Therefore, a reasonable juror could determine that Spicer stole Hebert's property. In addition to Spicer's possession of Hebert's property, there was testimony that Spicer admitted to Michael Jones that the truck was stolen. The jury is the final arbiter of a witness's credibility. ***Morgan v. State***, 681 So. 2d 82, 93 (Miss. 1996). Accordingly, there was enough legally sufficient evidence to determine Spicer robbed Hebert and convict Spicer of capital murder under Mississippi law. We find that Spicer's fifth assertion of error is without merit.

## VI. Denial of a Lesser-Included Offense Instruction

¶41. Spicer argues that the trial judge erred by not instructing the jurors that they could find Spicer guilty of the lesser-included offense of murder.[19] The trial judge refused two such instructions by Spicer on the basis that there was no evidence in the record that would justify the lesser-included offense of murder.[20] Thus, the only potential findings by the jury were that Spicer

---

[19]Murder is a lesser-included offense of capital murder. ***Howell v. State,*** 860 So. 2d 704, 744 (Miss. 2003).

[20]Spicer's proposed instruction D-3 stated:

The Court instructs the Jury that if the evidence warrants it and you so believe from the evidence in this case, beyond a reasonable doubt, then you may find the Defendant guilty of a lesser crime than Capital Murder. However, notwithstanding this right, it is your duty to accept the law as given to you by the Court, and if the facts and law warrant a conviction of the crime of Capital Murder, then it is your duty to make such findings

25

was guilty of capital murder or not guilty of any offense. Spicer asserts that because there was some evidence supporting his contention that he did not rob Hebert, he was entitled to a jury instruction of the lesser-included offense of murder that would allow the jury to convict him of a non-capital offense.

¶42. As support for his argument, Spicer cites *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980). In *Beck*, the United States Supreme Court held as unconstitutional the imposition of a death sentence on a defendant convicted by a jury of a capital offense when the jury was not permitted to consider a verdict of guilt of a lesser-included offense despite evidence supporting a lesser included offense. *Id.* at 638. An

---

uninfluenced by your power to find a lesser offense. This provision is not designed to relieve you from the performance of a unpleasant duty. It is included to prevent a failure of justice if evidence fails to prove the original charge but does not justify a verdict for the lesser crime.

Spicer's proposed instruction D-11A stated:

The Court instructs the Jury that you [sic] verdict should be written on a separate pierce [sic] of paper; need not be signed, and may be in one of the following forms:
        (1) If you find the Defendant, Freddie Sanford Spicer, Jr., guilty of Capital Murder of Edmond Herbert [sic], the form of your verdict shall be:
        "We, the Jury, find the Defendant, Freddie Sanford Spicer, Jr., guilty of Capital Murder of Edmond Herbert;" [sic]
                                OR
        (2) If you find the defendant Freddie Sanford Spicer, Jr., guilty of Murder of Edmond Herbert [sic], the form of your verdict shall be:
        "We, the Jury, find the Defendant, Freddie Sanford Spicer, Jr., guilty of Murder of Edmond Herbert;" [sic]
                                OR
        (3) If you find the Defendant, Freddie Sanford Spicer, Jr., not guilty, your verdict shall be in the following form:
        "We, the Jury, find the Defendant, Freddie Sanford Spicer, Jr., not guilty."

26

Alabama jury convicted Beck of capital murder for the robbery and murder of an 80 year-old man. *Id.* at 639. As a defense, Beck asserted that he did not kill the victim or intend the victim's death, but that instead his accomplice unexpectedly struck and killed the victim. *Id.* Under the Alabama death penalty statute at that time, the requisite intent to kill could not be supplied by the felony-murder doctrine. Thus, felony-murder could not be a lesser-included offense of the capital crime of intentional killing in the course of a robbery. Alabama law, however, specifically prohibited a trial judge from giving a jury the option of convicting a defendant of a lesser-included offense. The Supreme Court stated:

> when the evidence unquestionably establishes that the defendant
> is guilty of a serious, violent offense–but leaves some doubt with
> respect to an element that would justify conviction of a capital
> offense–the failure to give the jury the "third option" of convicting
> on a lesser included offense would seem inevitably to enhance
> the risk of an unwarranted conviction.

*Id.* at 637.

¶43. This Court's standard of review for challenges to jury instructions is as follows:

> The Court does not single out any instruction or take instructions out
> of context; rather, the instructions are to be read together as a whole.
> A defendant is entitled to have jury instructions <u>given</u> which present his
> theory of the case. This entitlement is limited, however, in that the
> court is allowed to refuse an instruction which incorrectly states the
> law, is covered fairly elsewhere in the instructions, or is without
> foundation in the evidence.

*Parks v. State*, 884 So. 2d 738, 746 (Miss. 2004) (citations omitted). Furthermore, this Court has stated:

> Even though based on meager evidence and highly unlikely, a defendant is entitled to have every legal defense he asserts to be submitted as a factual issue for determination by the jury under proper instruction of the court. Where a defendant's proffered instruction has an evidentiary basis, properly states the law, and is the only instruction presenting his theory of the case, refusal to grant it constitutes reversible error.

*Hester v. State*, 602 So. 2d 869, 872 (Miss. 1992) (citations omitted).

¶44. This Court has articulated the following test to determine whether there is an evidentiary basis for a lesser-included offense:

> Lessor included offense instruction should be granted unless the trial judge–and ultimately this court–can say, taking the evidence in the light most favorable to the accused, and considering all reasonable references which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lessor included offense (and conversely not guilty of at least one element of the principal charge).

*Agnew v. State*, 783 So. 2d 699, 702-03 (Miss. 2001) (quoting *Graham v. State*, 582 So. 2d 1014, 1017 (Miss. 1991).

¶45. The facts in *Beck* are distinguishable from the facts of the current case. First, Mississippi courts are not governed by the same capital sentencing law at issue in *Beck*. Miss. Code Ann. § 99-17-20 states:

> The judge, in cases where the offense cited in the indictment is punishable by death, may grant an instruction for the state or the defendant which instructs the jury as to their discretion to convict the accused of the commission of an offense not specifically set forth in the indictment returned against the accused.

¶46. Second, Spicer presented no evidence before the trial court or this Court that would warrant a lesser-included offense instruction of murder. The United States Supreme Court stated in a later opinion interpreting *Beck*:

28

> **Beck** held that due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction. But due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction. The jury's discretion is thus channeled so that it may convict a defendant of any crime fairly supported by the evidence.

*Hopper v. Evans*, 456 U.S. 605, 611, 102 S. Ct. 2049, 2053, 72 L. Ed. 2d 367 (1982). Spicer presented no evidence that he acted with "deliberate design," a "depraved heart," or "in commission of any felony" other than the ones listed under Miss. Code Ann. § 97-3-19(2), the capital murder statute.[21] Spicer's basis for his argument that there was evidence to "support a verdict of guilt of a non-capital offense" is his continued assertion that he had permission to drive Hebert's truck. Spicer's argument is a defense to the charge of capital murder, not evidence of

---

[21]Miss. Code Ann. § 97-3-19(1) states:

(1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:

(a) When done with deliberate design to effect the death of the person killed, or of any human being;

(b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual;

(c) When done without any design to effect death by any person engaged in the commission of any felony other than rape, kidnaping, burglary, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, or in any attempt to commit such felonies;

(d) When done with deliberate design to effect the death of an unborn child.

murder under Miss. Code Ann. § 97-3-19(1). In addition, there is too much probative evidence in the record of the underlying felony of robbery for a reasonable juror to find Spicer guilty of simple murder beyond a reasonable doubt. There is evidence that he stole the sword because he was in possession of it after Hebert's death and it had Hebert's blood on it. There is also a lack of evidence that Spicer possessed a spare key to Hebert's truck. This strongly suggests that he not only stole the keys, but also the truck. Even if the jury believed Spicer had permission to use the truck on previous occasions, it seems unlikely that he had permission here because Hebert was deceased.

¶47. Taking the evidence in a light most favorable to the accused, no reasonable jury could find beyond a reasonable doubt that the defendant was guilty of the lesser-included offense. We find that the trial court correctly rejected the murder instruction because it was not warranted by the facts of this case.

### VII. Grant of Jury Instruction S-8 and the State's Burden of Proving Intent to Commit the Underlying Felony

Spicer argues that Jury Instruction 8[22] misled the jury on the intent necessary for a

---

[22]Both Spicer and the State in their briefs refer to Instruction 8 as "Instruction S-7A." However, their citations to "Instruction S-7A" correspond with Instruction 8 in the Clerk's Papers and they quote Instruction 8 as "Instruction S-7A."

for a conviction of capital murder as defined in Miss. Code Ann. § 97-3-19(2)(e).[23]  According

to Spicer, Instruction 8 "not only did not focus the jury's attention on the issue of intent, but

peremptorily instructed the jury that the issue of intent was irrelevant."  Thus, Spicer asserts,

Instruction 8 "created an irrebuttable presumption relieving the jury of its responsibility of

determining whether Spicer intended to commit robbery at the time of the killing."

¶48.    In support of his argument Spicer cites ***Jenkins v. State***, 607 So. 2d 1171 (Miss.

1992).  In ***Jenkins***, the defendant was convicted of capital murder with the underlying felony

of robbery.  ***Id.*** at 1173-74.  Jenkins objected to the following jury instruction:

> The Court instructs the Jury that if a person enters upon the commission of
> a crime involving danger to human life, such as robbery, said person is
> criminally accountable for death caused in the common enterprise.  It need not
> be that the design is to commit the particular crime which is subsequently
> committed, but there must be a preconcerted plan to do some unlawful act.
> Therefore, if you find from the evidence in this case that all of the elements of
> Capital Murder, as defined in the Court's instructions, have been proved beyond
> a reasonable doubt, you must find the Defendant WILLIAM WAYNE JENKINS,

---

[23]Jury Instruction 8 states:

> This Court instructs the Jury that in a case of Capital Murder the fact that the victim
> was dead at the time of taking his property does not mitigate against the conclusion of
> robbery.  If the intervening time between the murder, if any, and the time of the taking of
> the property, if any, formed a continuous chain of events, the fact that the victim was dead
> when the property was taken cannot absolve the Defendant from the crime.  If you should
> find from the evidence in this case beyond a reasonable doubt and to the exclusion of every
> reasonable hypothesis consistent with innocence that the Defendant, Freddie Spicer, Jr.,
> killed and murdered Edmond Hebert and then, after the said Edmond Hebert was dead,
> took his property; and if you should further find beyond a reasonable doubt that the
> intervening time of the murder, if any, and the time of the taking of the property, if any,
> formed a continuous chain of events, the fact that Edmond Hebert was dead when the
> property was taken does not absolve the Defendant from the crime of Capital Murder.

31

guilty of the crime of Capital Murder, even though, at the outset, he may not have intended to do the particular thing constituting the crime.

*Id.* at 1179. Jenkins objected that the instruction was erroneous "because it informed the jury that they could convict [him] of capital murder even if he did not form the intent to rob until the homicide had occurred." *Id.* After having earlier in the opinion reversed Jenkins's conviction due to discovery violations by the State, this Court replied to Jenkins's assertion that the above jury instruction was given in error:

> Without a thorough review of the merits of this claim, we note that Instruction S-3 was, at best, confusing to the jury and, at worst, peremptory in nature. S-3 did nothing to focus the jury's attention upon the issue of Jenkins' intent. Consequently, it merely obfuscated the issue and left the jury shrouded by smoke. Upon retrial, we must recommend that S-3 be revised or deleted from the court's instructions.

*Id.* at 1179-80.

¶49. Spicer is procedurally barred from asserting his seventh allegation of error. At trial, Spicer objected to instruction 8 "on the basis that there is no time of death proven."[24] Spicer did not place before the trial judge the present issue of whether Instruction 8 relieved the State of the burden of proving intent to commit the underlying felony of robbery. This Court cannot find that a trial judge committed reversible error on a matter not brought before him or her to consider. *Montgomery v. State*, 891 So. 2d 179, 187 (Miss. 2004). "[A]n objection on one

---

[24]Spicer's attorney's entire comments regarding the objection were as follows:

BY MR. HURT: We object to this instruction on the basis that there is no time of death proven. If you'll look at the last part of this instruction, it talks about the intervening time and the fact that Edmond Hebert was dead when the property was taken. That was never established by the State. There is no time of death in this case. I think you would agree with me on that one. There is no time of death ever proved in this case. Was there?

or more specific grounds constitutes a waiver of all other grounds." ***Doss v. State***, 709 So. 2d at379 (quoting ***Conner v. State***, 632 So. 2d 1239, 1255 (Miss. 1993)).

¶50.    Notwithstanding the procedural bar, we find that Spicer's argument is without merit. "In determining whether error exists in granting or refusing jury instructions, the instructions must be read as a whole; if the instructions fairly announce the law and create no injustice, no reversible error will be found." ***Martin v. State***, 854 So. 2d 1004, 1009 (Miss. 2003). The trial judge did not instruct the jury that Spicer's intent was irrelevant nor did he relieve the jury of its responsibility of determining whether Spicer intended to commit robbery at the time of the killing.    Instead, the trial judge allowed Instruction 8 which correctly stated the law regarding the "continuous chain of events" theory in capital cases and when the underlying felony of robbery could have occurred.  *See* ***Duplantis v. State***, 708 So. 2d 1327, 1343 (Miss. 1998).[25]  This Court said in ***West v. State***:

---

[25]The instruction at issue in ***Duplantis*** stated:

> The Court instructs the jury that in a case of capital murder the fact that the victim was dead at the time of taking his property does not mitigate against the conclusion of robbery.  If the intervening time between the murder, if any, and the time of the taking of the property, if any, formed a continuous chain of events, the fact that the victim was dead when the property was taken cannot absolve the defendant from the crime.
>
> If you should find from the evidence in this case beyond a reasonable doubt and to the exclusion of every reasonable hypothesis that the Defendant, David Duplantis, killed and murdered Gary Thrash and then, after the said Gary Thrash was dead, took his property; and if you should further find beyond a reasonable doubt that the intervening time between the time of the murder, if any, and the time of the taking of property, if any, formed a continuous chain of events, the fact that Gary Thrash was dead when the property was taken does not absolve the Defendant from the crime of Capital Murder.

708 So. 2d at 1342-43.

> [W]e construed our capital murder statute and held that "the underlying crime begins where an indictable attempt is reached . . .." An indictment charging a killing occurring "while engaged in the commission of" one of the enumerated felonies includes the actions of the defendant leading up to the felony, the attempted felony, and flight from the scene of the felony. The fact that the actual moment of the victim's death preceded consummation of the underlying felony does not vitiate the capital charge.

553 So. 2d 8, 13 (Miss. 1989) (citations omitted). *See also Simmons v. State*, 805 So. 2d 452, 477-78 (Miss. 2001); *Turner v. State*, 732 So. 2d 937, 949-50 (Miss. 1999). The trial judge's instruction in the present case mirrored this Court's holding in *West* and other cases. Furthermore, the trial judge's instruction is almost an exact quote of the instruction upheld by this Court in *Duplantis*. The instruction cited by Spicer from *Jenkins* is not similar to the one at issue in the present case, and this Court's disapproval of the *Jenkins* instruction is not controlling. We find that Spicer's seventh assertion of error is without merit.

### VIII. "Send a Message" Argument in the Guilt Phase

¶51.     Spicer asserts that the prosecutor made an improper "send a message" argument at the close of the guilt phase by stating:

> And you see, that's why now we are afraid to be good neighbors. Acts like that prevent us from being close to people that we even live near. Acts repaid this way are the reasons that we're strangers with our very next door neighbors. The reason that we don't allow ourselves to associate or let our children out in the front yard is because this is the way we get repaid.

> May I submit to you that it might be payback time? May I submit to you that this might be an opportunity for us to say in George County: We can't keep you from doing it, but you will pay the price for doing it. And other people are going to know that you paid the price.

Spicer asserts that these statements amount to prosecutorial misconduct and therefore, require that his conviction be reversed and this Court grant him a new trial.

34

¶52. Spicer failed to object during closing argument; and therefore, it is arguable that this appeal should be procedurally barred. However, this Court has held that despite the procedural bar it will review this appeal "if the argument is so 'inflammatory' that the trial judge should have objected on his own motion." *Payton v. State*, 785 So. 2d 267, 270 (Miss. 1999) (citing *Gray v. State*, 487 So. 2d 1304, 1311 (Miss. 1986)). When compared with other "send a message" cases, the above quoted language tracks examples where this Court has found prosecutorial misconduct. In *Williams v. State*, 522 So.2d 201, 208 (Miss. 1998) the following exchange was found to "send a message"– "[b]y your vote, you can make the statement clearly, steadfastly, and unequivocally that law or [sic] order exists for everyone in Harrison County." Whereas in *Payton,* the following was found to "send a message"– "[s]end a message to these older, more mature, criminals, 'We are not going to let you ruin young people's lives like you have ruined these three people's lives, and all these lives you endangered in the process.'" *Payton*, 785 So. 2d at 270. We proceed to address the appeal on its merits.

¶53. We have repeatedly condemned the use of "send a message" arguments and warned prosecutors accordingly. *See, e.g.*, *Payton*, 785 So. 2d at 270; *Evans v. State*, 725 So. 2d ,613, 537 (Miss. 1997); *Wilcher v. State*, 697 So. 2d 1123, 1139 (Miss. 1997); *Hunter v. State*, 684 So. 2d 625, 637 (Miss. 1996); *Williams v. State*, 522 So. 2d 201, 209 (Miss. 1998). Jurors are the representatives of the community, but must vote based on the evidence shown at trial and not in their representative capacity. *Williams*, 522 So. 2d at 209. "The function of the jury is to weigh the evidence and determine the facts. When the prosecution

wishes to send a message they should employ Western Union. Mississippi jurors are not messenger boys." *Id*. However, in analyzing this error it is necessary to examine the surrounding circumstances and be careful not to take a statement out-of-context. *Id.* For this purpose, we consider not only look to the prosecutor's comments but any comments made by defense counsel. *Ishee v. State*, 799 So. 2d 70, 75 (Miss. 2001) (quoting *Edwards v. State*, 737 So. 2d 275, 299 (Miss. 1999)). In the present case the prosecutor's comment stands on its own. It was neither proceeded by or followed by one from defense counsel. The prosecution was not attempting to merely right the scale tipped by defense counsel but was launching its own attack. *See Ishee*, 799 So. 2d at 75.

¶54. Even though it was unprovoked, the statement is not per se reversible error. *Payton*, 785 So. 2d at 271(declining to adopt the rule that such comments are per se reversible error). However, we have said that depending on the surrounding circumstances, this error may on its own, constitute reversible error. *Id*. We have not given further guidance to determine when it might be reversible error, but have cautioned against using harmless error analysis to "transgress the rules of fair argument that are repeatedly promulgated by this Court." *Id*. We find that this is a fertile opportunity to clarify this ambiguity and to do so, we turn to sister jurisdictions.

¶55. We adopt the two-part test annunciated by the Ohio Court of Appeals in *State v. Grimes*, 2005 WL 120064 (Ohio Ct. App. 2005). In that case the Ohio court held that in order to find reversible error, the court must determine (1) whether the remarks were improper, and (2) if so, whether the remarks prejudicially affected the accused's rights. *Id*. at ¶ 18. The

statement will not be improper simply because it sends a message that the community will not tolerate violence, but if it makes an appeal based on unproven sentiments of the community. *See Wilson v. State*, 2005 WL 2875009 at *3 (Tex. App. 2005). These are statements which tend to cajole or coerce a jury to reach a verdict for the purpose of meeting public favor and not based on the evidence. *See Commonwealth v. Mitchell*, 165 S.W.3d 129, 132 (Ky. 2005). Put another way, the focus of a prosecutor's closing argument should be on the facts in evidence and not the broader problems of crime in society "lest the remediation of society's problems distract jurors from the awesome responsibility with which they are charged." *People v. Liner*, 356 Ill. App. 3d 284, 297, 826 N.E.2d 1274, 1287(Ill. App. Ct. 2005). It must be clear beyond a reasonable doubt, that absent the prosecutor's comments, the jury could have found the defendant guilty. *Grimes*, 2005 WL 120064 at ¶ 18. This goes beyond a finding of sufficient evidence to sustain a conviction. *Id*. at ¶ 34. ¶56. In the present case the prosecutor's statements were improper. It is clear that his statements were an attempt to use emotion to overcome possible reluctance in the jury, making a baseless appeal to the jurors that they needed to vote as representatives of the community and not based on the evidence that was before them. However, if the offending statement is removed from the record it remains clear, beyond a reasonable doubt, that there was sufficient evidence for the jury to find Spicer guilty of capital murder. The error does not warrant reversal.

## IX. Indictment Failed to Charge Aggravating Circumstances or a Mens Rea Requirement

¶57. Spicer argues that his death sentence must be vacated because the indictment failed to include a statutory aggravating factor or the mens rea standard required for capital murder.

Spicer did not raise this issue before the trial court.  However, challenges to the sufficiency of an indictment will not be procedurally barred and may be raised for the first time on appeal. *State v. Berryhill*, 703 So. 2d 250, 253 (Miss. 1997).  For support of his argument, Spicer cites *Apprendi v. N.J.*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

¶58.    This Court has previously rejected the argument made by Spicer.  *See*, *e.g.*, *Brown v. State*, 890 So. 2d 901, 918 (Miss. 2004); *Stevens v. State*, 867 So. 2d 219, 225-27 (Miss. 2003).  We have held that *Apprendi* and *Ring* address issues wholly distinct from the present one, and in fact do not address indictments at all.  *Brown,* 890 So. 2d at 918.  The purpose of an indictment is to furnish the defendants notice and a reasonable description of the charges against them so that they may prepare their defense.  *Williams v. State*, 445 So. 2d 798, 804 (Miss. 1984).  Therefore, an indictment is only required to have a clear and concise statement of the elements of the crime the defendant is charged with.  *Id*.  "Our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment."  *Brown*, 890 So. 2d at 918.  Therefore, when Spicer was charged with capital murder he was put on notice that the death penalty may result, what aggravating factors may be used and the mens rea standard that was required.  *See Stevens*, 867 So. 2d 227.  We find that Spicer's ninth assertion of error is without merit.

### X.    Removal of Jurors for Cause

¶59.    Spicer argues that his death sentence must be vacated because the trial court erroneously removed veniremembers Creekmore and Peters for cause based on their views on

the death penalty. According to Spicer, these potential jurors expressed reservations to imposing a death sentence but did not state that they could not impose the death penalty. Thus, Spicer asserts, Creekmore and Peters were qualified to serve and his death sentence must be vacated because a potential juror was erroneously excused from the jury. Spicer cites *Gray v. Mississippi*, 481 U.S. 648, 659, 107 S. Ct. 2045, 2052, 95 L. Ed. 2d 622 (1987), in support of his argument.

¶60. In *King v. State*, this Court stated "[t]he test for determining when a prospective juror's views on the death penalty justify his removal is whether the trial court finds that the 'juror's views would prevent or substantially impair the performance of his duties in accordance with his instructions and his oath' thus leaving the trial court 'with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.'" 784 So. 2d 884, 887 (Miss. 2001) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424-26, 105 S. Ct. 844, 852-53, 83 L. Ed. 2d 841 (1985)). If the judge is concerned with the response given, he or she must further determine whether the potential juror could follow the law as instructed even if the juror expressed a general disapproval of the death penalty. *Id.* Therefore, deference must be paid to the trial judge who sees and hears the juror. *Id.* (quoting *Wainwright*, 469 U.S. at 426).

¶61. This Court has long held that a trial judge has wide discretion in determining whether to excuse prospective jurors including those challenged for cause. *Smith v. State*, 802 So. 2d 82, 86 (Miss. 2001); *Miss. Winn-Dixie Supermarkets v. Hughes*, 247 Miss. 575, 156 So.

2d 734, 738 (1963).   This is a judicial question; and therefore, this Court will not overturn the trial court unless it is clearly wrong.  *Carr v. State*, 555 So. 2d 59, 60 (Miss. 1989).

¶62.   Spicer failed to object at trial to the removal of veniremembers Creekmore and Peters. Therefore, he is procedurally barred from raising this issue on appeal.  *Manning v. State*, 735 So. 2d 323, 346 (Miss. 1999).   On the merits, we find that Spicer's assertion that the trial judge improperly removed two potential jurors is incorrect.   The relevant parts of the trial court's examination of Creekmore are as follows:

> Q. [Court]:   Sir, do you have any religious or conscientious or moral scruples that would prevent you, under any circumstances, from imposing the death penalty when the law would allow it or the facts of this particular case, and the facts of this particular case would warrant it?
>
> A. [Mr. Creekmore]:   Under one circumstance would I impose death, and that's if all 12 were 100 percent convinced that it was a capital offense, and that, if the victim's family could not find any forgiveness whatsoever in their heart.
>
> Q:   Well, are you telling me that you would require certain evidence from the victim's family?
>
> A:   I would require them to say, "I want the man put to death."
>
> Q:   You would require such evidence before–
> A:   the jury convicted him, I want him put to death.
>
> Q:   I'm sorry?
>
> A:   I would require them to say: You, as the jury, are 100 percent sure this man's guilty.  We want you to put him to death.

Q: Now, let me back up and try to explain this. In Mississippi, as in several other states, numerous other states, only a jury is authorized, based upon all the evidence of a particular case, under proper instructions of law from the Court, and only when the law would allow a jury to consider–you know, those are big ifs in qualification–only when the law would allow a jury to consider it, only a jury in the state of Mississippi has the authority to return a verdict, or a sentence of death, including the death penalty. I believe I can tell you now that only a jury has that authority. And whether or not the victim's family, friends, relatives or anyone else has an opinion on that issue, it is not an area of the jury's concern as to whether or not the death penalty should be imposed.

A: Well, are they allowed to make a statement before the jury, the sentencing?

Q: Well, before–I would have to determine the type–you're asking me both a factual question for your benefit and a legal question that I would have to be–I would have to know the circumstances before I could, you know, rule on anything of that nature, the admissibility of evidence.

A: You should probably excuse me.

Q: Okay. But you are telling me that you would require, irregardless of whether you hear it during the case, whether or not the Court–my responsibility is to rule on the admissibility of evidence, you know, the admission of evidence to a jury prior to it coming in. You would require that type of information before you would even consider imposition of a death penalty? Would you require it?

A: I would require the jury–

Q: Now, there is a difference between "like to have it" and "require." And if, under the facts of this particular case–

A: I would require it.

Q: You would.

41

A: I'm stating it the best way I know how. I would require that the jury be 100 percent convinced that the man is guilty of capital murder. And then I would want to hear the victim's family say: I want this man put to death.

Q: Okay. Thank you, Mr. Creekmore. Let me ask you this: That's what you require.

A: Yeah.

Q: Could you set that conviction, your own personal conviction in that regard, could you set it aside?

A: No.

¶63. Later, during additional voir dire, Creekmore stated he could consider the death penalty: "If you tell me that the law says this, I will obey that law, because I'm instructed by the higher Deity that that's what I'm supposed to do." However, moments later Creekmore stated: "If I have to consider it, then I will consider it. And the law does provide for a death penalty. I'll have to consider that, just like I would consider thou shalt not kill."

¶64. The relevant parts of the trial court's examination of Peters are as follows:

A [Peters]: I have a very hard time with the death penalty.

Q [Prosecutor]: Okay. That also has some language in there–I would have a hard time. And I'm not making fun of you at all.

A: That's fine.

Q: Sometimes we mean, I'm not going to do it, or we mean, I don't think I can do it.

A: Can I say that, under no circumstances, I would not . . .

42

Q: All right. What circumstances would you, would you consider–and see how I keep going at you?

A: I see, but I can go many places–

Q: Okay, but–but--

A: But I, I would not be ready to easily do that at all.

Q: Okay. You would not be ready to easily do it. But realistically, is there any circumstances you can think of right now, here, today, that you could impose the death penalty? Realistically?

A: I'm sure there could be.

Q: Tell me then.

A: Tell you?

Q: Yeah.

A: Well, I don't see it in this circumstance.

Q: Okay. But you don't know what the circumstances are. You may have an idea–and I'm not trying to dispute you–you may have an idea of the facts that's going to generate out of this, but we may surprise you, too. It may not be exactly the way you think it is. You still can't think of a reason that, a circumstance that you could give the death penalty. Even though there might be one out there, you can't think of one?

A: You know, if a person is a truly evil person, you know, and there is no hope of them to ever turn around, that's–

Q: I wish I had a scale–

43

A:  There's not a scale.  That's why–

Q:  from sorry to very bad to–

A: And it doesn't exist.  And that scale can change.

Q:  I know.

A:  So, there is not particular circumstance I could give you.  But I'm just letting you know that it would not be an easy thing for me to do, to give someone the death penalty.

Q:  Realistically, do you think you could ever really do it?

A:  If I felt it need be, yes.  That would be–

Q:  Leave out Saddam Hussein.  Give me an example of what you think you could give the death penalty?

A:  I don't know.

Q:  All right.  Well, I can't force an answer out of you, but there is a quirk in this thing, and you probably can see it.  People on the fence are people that frighten me.  Have you ever read in a newspaper or listened in the media to a circumstance that was so horrific that you said to yourself, I could give the death penalty there?

A:  No.  I have, I have a very hard time with it.

Q:  So, nothing has been brought to your attention so far that was so horrific that you could give the death penalty on?

A:  No.

44

In response to further questioning, Peters told the trial court that "it would be very, very difficult" and "awful difficult" to return a death sentence.

¶65.   "A juror's position on the death penalty must be unmistakably clear, or a trial judge may properly remove them for cause in a capital case." **Brown v. State**, 890 So. 2d 901, 910 (Miss. 2004).   Furthermore, this Court has "upheld the dismissal of jurors who had given inconsistent answers with regard to their ability to return a death sentence." **Pinkney v. State**, 538 So. 2d 329, 535 (Miss. 1988), *vacated on other grounds*, 494 U.S. 1075, 110 S. Ct. 1800, 108 L. Ed. 2d 931 (1990).   Based on our deferential standard of review, the trial judge did not commit error by excluding veniremembers Creekmore and Peters because of  uncertainty whether they could impose the death penalty.   The two men voiced reservations to the application of the death penalty and could not adequately assure the trial judge they would be able impose the death penalty if called upon by the State.   We hold that the trial court did not err in finding the two veniremembers' beliefs would substantially impair their ability to follow the law and perform their duties as a juror according to their oath.   Spicer's tenth assertion of error is without merit.

## XI.  Prosecutor's Closing Argument in Sentencing Phase

¶66.   During closing argument of the sentencing phase, defense counsel implored the jury, as one of the mitigating factors, not to punish Spicer because of his previous infractions and prison sentences.   According to defense counsel, Spicer had already paid his penalty for the previous crimes and should not be punished for them again.   Furthermore, Spicer's attorney emphasized to the jury that they had the option to sentence Spicer to life without parole instead

of death.    Defense counsel charged the jury that they are under no obligation to impose the death penalty calling it merely an "option" and he left them with the thought that "[i]t's a hard thing to put someone to death, and you hold his life in your hands."

¶67.    The State responded during rebuttal by emphasizing the concept of retribution in the English and American legal systems.    Spicer objected that the State was misstating the law and improperly making an "eye for an eye" argument, but the trial judge overruled the objection. In response to Spicer's attorney's plea for life without parole, the prosecutor stated: "when I hear someone say, mercy, all I have to do is look at the pictures, when I hear someone say, think real hard before you give him death–you're not giving him death.    He's giving himself death."    The prosecutor then went on to argue that Hebert's family could not represent themselves in court and thus the prosecutor had to seek justice for Hebert's death.    The prosecutor stated:

> I become a surrogate father to Edmond Hebert, and that's why I can say this with all candor and with all honesty.  I look at cases, and not every case do I seek the death penalty.  I try to find reasons that maybe we ought to work something else out.  This is not one of them.

¶68.    On rebuttal, the prosecutor challenged Spicer's mitigating circumstances by stating:

> You see, ladies and gentlemen, I asked you, would you do your duty, during voir dire.    And I submit to you that the weak mitigating circumstances will never amount to the aggravating circumstances unless you were predisposed and, in fact, never wanted to give the death penalty, because if there ever was a case in George County that deserved it, this is the one.    And if you back away from it, then you're backing away from it because you weren't honest and candid in voir dire.

46

¶69. Spicer objected to this and other statements regarding the honesty of the jurors, and not following their oath, arguing that the prosecutor was "trying to explain to the jury that they have to give [Spicer] the death penalty." The trial court first overruled Spicer's objection without explanation, but after the prosecutor continued briefly along similar lines, and another objection was made, the trial court "sustain[ed] the objection to that portion of [the prosecutor's] argument." Spicer now argues that the prosecutor repeatedly misstated the law and argued his personal opinion on the appropriateness of the death penalty in this case and minimized the jury's role in sentencing. According to Spicer, the State improperly argued that the jury had promised during voir dire to impose the death penalty if they found Spicer guilty and that the jurors would not be the ones putting the defendant to death. Thus, Spicer concludes, the above prosecutorial misconduct deprived him of a fundamentally fair trial and violated his rights under state and federal law.

¶70. There is no distinction between the latitude given by this Court with regard to closing arguments during the sentencing phase as compared to the guilt phase. *Wells v. State*, 903 So. 2d 739, 742-43 (Miss. 2005). Attorneys are afforded a wide latitude in arguing their case to the jury, but they are not allowed to employ tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury. *Sheppard v. State*, 777 So. 2d at 661. This Court will reverse a conviction because of lawyer misconduct if it concludes that the natural and probable effect of the improper argument was to create unjust prejudice against the accused and was likely to result in a decision influenced by the prejudice so created. *Id.* Furthermore, alleged improper prosecutorial comment must be considered in context with the circumstances of the case. *Ahmad v. State,* 603 So. 2d 843, 846 (Miss. 1992). In this case,

47

the Court must review the prosecutor's comments in conjunction with the "opening salvo" from defense counsel. *Edwards v. State*, 737 So. 2d 275, 299 (Miss. 1999).

¶71. We find that the prosecutor's comments did not create unjust prejudice that influenced the verdict. The prosecutor was not making statements of law when discussing the concept of retribution, but was instead laying the historical foundation of an argument to rebut defense counsel's plea for mercy. We have held that "counsel may draw upon literature, history, science, religion, and philosophy for material for his argument." *Carr v. State*, 655 So. 2d 824, 853 (Miss. 1995) (quoting *Nelms & Blum Co. v. Fink*, 159 Miss. 372, 383, 131 So. 817, 820 (1930)). The other comments to which Spicer objects were also in response to Spicer's argument for mercy and life without parole. The prosecutor did not argue that the jurors "promised" on voir dire to impose the death penalty nor did he minimize the juror's role by asserting they were "not giving [Spicer] death." Instead, the prosecutor was responding to Spicer's attorney's argument for life without parole by urging the jury to conclude Spicer deserved the death penalty. In that regard the prosecutor was acting as an advocate for the State in an effort to encourage the jurors to draw conclusions from the evidence and to make suggestions as to a proper conclusion. *See Evans v. State*, 725 So. 2d at 671 (quoting *Blue v. State*, 674 So. 2d 1184, 1208 (Miss. 1996)). There was nothing inappropriate with the prosecutor's comments. Accordingly, we find that Spicer's eleventh assertion of error is without merit.

### XII. Consideration of the Aggravators of Robbery and Pecuniary Gain

48

¶72.    Spicer asserts that it was error for the trial judge to submit to the jury the following aggravating factor:    "The capital offense was committed for pecuniary gain during the course of a robbery."[26]    According to Spicer, these two aggravating circumstances cannot be submitted together nor should they have been submitted separately to the jury.  We do not agree and find Spicer's analysis incorrect.

¶73.    Spicer did not object to the submission of the aggravating circumstances and is thus procedurally barred from appealing.  *Davis v. State*, 660 So. 2d 1228, 1247 (Miss. 1995). Notwithstanding the procedural bar, we find Spicer's assertion without merit.    Spicer relies on *Willie v. State*, 585 So. 2d 660, 681 (Miss. 1991), for the proposition that an instruction like the present was impermissible.  In *Willie* this Court found that instructing the jury on two separate aggravators for pecuniary gain *and* robbery allowed the jury to doubly weigh the same evidence.  *Willie*, 585 So. 2d at 680-81.  In *Turner v. State*, 732 So. 2d 937 (Miss. 1999), we dealt with an argument similar to the one presently raised where pecuniary gain and robbery were instructed as part of one aggravator.  In *Turner* this Court upheld the conviction on the principle that the two aggravators were essentially one and therefore the single instruction was appropriate whereas two separate instructions were not.  *Id.*  at 954.  The present case tracks *Turner* and as a result there was nothing impermissible with the instruction.    We find that Spicer's twelfth assertion of error is without merit.

---

[26] The Court's Jury Instruction 1, given in the sentencing phase, set forth the various responsibilities of the jurors in reaching their decision as to the sentence.  It stated, inter alia, that they were to "[c]onsider only the following elements of aggravation in determining whether the death penalty should be imposed:
1.  The defendant was previously convicted of a felony involving the use or threat of violence to the person.
2.  The capital offense was committed for pecuniary gain during the course of a robbery"

## XIII. Admission of Arrest Photographs of Defendant

¶74. The State offered nine photographs[27] of Spicer during the testimony of officer Kimberly Versiga of the Jackson County Sheriff's Department. She testified that she took these photographs while Spicer was in jail after he had been arrested. The purpose was to document any injuries Spicer may have suffered from either the victim or by the police officers who affected the arrest, and for tattoo identification. The only injury Officer Versiga observed on Spicer, was a bruise on his right hand. Spicer asserts that the trial court erred by admitting the photographs into evidence, over his objection, because there were no allegations of injuries, the explicit nature of some of them would serve only to inflame and prejudice the jury and the photographs had no probative value. However, he fails to explain or provide substance to these general allegations. He points out that five of the nine photographs taken by law enforcement officials showed him dressed only in shorts and revealed numerous tattoos on his body. Additionally, according to Spicer, no witness identified him based on these tattoos or even testified as to observing the tattoos.

---

[27]Specifically, the pictures show the following: a full-length shot of Spicer in his street clothes which was taken from some distance away; a somewhat blurry shot of Spicer's head and shoulders, in which indistinguishable tattoos on his shoulders can be seen; a blurry profile shot of Spicer's head, in which no tattoos are shown; a shot of Spicer's torso and tattoos of what appears to be a large bird and a torch on his chest and part of a spider web on his shoulder; a shot of Spicer's upper back and numerous tattoos, the only one of which can be distinguished appears to be a cross; a shot of the backs of Spicer's legs and what appears to be a flower tattoo on his left leg; a shot of the fronts of Spicer's legs showing some undistinguishable tattoos and one of which appears to be a heart with an arrow through it and another which appears to be a skull wearing a hat; a shot of the tops of Spicer's hands, one with a tattoo that cannot be distinguished on it and one with tattoos of an anchor and the word "LOVE" on it; a shot of Spicer's palms and portions of his arms, in which small parts of tattoos can be seen, but it cannot be distinguished what the tattoos are.

¶75.    The admissibility of photographs lies in the sound discretion of the trial court. *Gray v. State*, 728 So. 2d 36, 57 (Miss. 1998) (citing *Jackson v. State*, 672 So. 2d 468, 485 (Miss. 1996)).    The trial court's decision will be overturned only if that discretion is abused. *Gray*, 728 So. 2d at 57.    This discretion is almost unlimited, regardless of the gruesomeness, repetitiveness and the extenuation of probative value. *Id*. at 57-58.    In fact, we have only found one instance where this Court held that a photograph was too prejudicial to be admitted.    This picture was a close-up photograph of a partly-decomposed, maggot-infested skull. *See Woodward v. State*, 726 So. 2d 524, 535 (Miss. 1997).

¶76.    The issue of admissibility of photographs of the tattooed body of a defendant, in this context, has not previously been before this Court.    Here, there is no dispute that the photographs accurately displayed Spicer's appearance at the time of the murder. Since photographing of a suspect is a routine part of any investigation, the photographs were not unanticipated.    The photographs were relevant to demonstrate Spicer's condition close to the time of the murder and his alleged fight with Hebert.    The features of the tattoos were not clear from the photographs, and there was no explanation or description put into evidence as to their meaning. *See* Miss. R. Evid. 403.

¶77.    We find that these photographs were relevant and did not prejudice Spicer as he claims they did.    Part of Spicer's defense was that he killed Hebert in self-defense.    These photographs were relevant to disprove that defense.    Had Spicer been engaged in self-defense it would likely have resulted in injuries greater than the bruise he suffered on his hand.    Therefore, these photographs were relevant.    Further, they were not prejudicial because they did not depict

51

gruesome images that would inflame the mind of the jury. Spicer asserts that photographs of

his tattooed body would not be accepted in a rural east Mississippi court. However, Spicer

does not support this arguments with any evidence, factual or legal. Given the deference that

this Court has given to trial courts and the one example of a photograph being too gruesome

to be displayed, we find that Spicer's thirteenth assertion of error is without merit.

### XIV. Cumulative Error

¶78. Spicer asserts as his last assignment of error that his conviction and sentence should

be reversed because of the cumulative effect of the errors by the State and trial judge. He

does not recite any specific errors on which he bases his conclusion, stating rather that given

the prejudicial impact of errors discussed in his brief, it cannot be said that Spicer's trial met

the exacting standards of reliability required by the Constitution, citing *Eddings v. Oklahoma*,

455 U.S. 104, 118, 102 S. Ct. 869, 878-79, 71 L. Ed. 2d 1 (1982) (O'Connor, J., concurring).

The State asserts that in order for there to be cumulative error, there must be at least one

reversible error. The State cites *Simmons v. State*, 805 So. 2d 452, 509 (Miss. 2001), for this

proposition. The State says that since there is no reversible error, there cannot be cumulative

error. Alternatively, the State says that there was not an accumulation of non-reversible errors

that resulted in an unfair trial either. We find the State's analysis incorrect, but arrive at the

conclusion that the aggregate of any error present in this case does not require reversal.

¶79. In a recent decision this Court said:

> what we wish to clarify here today is that upon appellate review of cases in
> which we find harmless error or any error which is not specifically found to be
> reversible in and of itself, we still have the discretion to determine, on a case by
> case basis, as to whether such error or errors, *although not reversible when*

*standing alone*, may when considered cumulatively require reversal because of the resulting cumulative effect.

***Byrom v. State,*** 863 So. 2d 836, 847 (Miss. 2003) (emphasis added). This decision makes it clear that there need not be reversible error in order to consider cumulative error. ***Byrom*** is the clearest expression from this Court as to how cumulative error should be applied. We now make it clear that our holding in ***Byrom*** is controlling and that cumulative error analysis does not require the presence of at least one reversible error.

### XV. Proportionality Review

¶80. This Court must also review the death sentence in accordance with Miss. Code Ann. § 99-19-105(3), which states:

(3) With regard to the sentence, the court shall determine:

(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

(b) Whether the evidence supports the jury's or the judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;

(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and

(d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error or both.

Under this analysis, there is no evidence supporting a finding that the death sentence was imposed under the influence of passion, prejudice or other arbitrary factor. As previously discussed, the evidence supports the trial court's finding that the statutory aggravating factor of robbery was proven beyond a reasonable doubt. Upon comparison to other factually similar cases where the death sentence was imposed, see Appendix, the sentence of death is not disproportionate in this case. Having given individualized consideration to Spicer and the crime in the present case, we conclude that there is nothing about Spicer or his crime that would make the death penalty excessive or disproportionate

## CONCLUSION

¶81.    We hold that Spicer's assignments of error lack merit and affirm his conviction by the George County Circuit Court of capital murder and his sentence of death under Miss. Code Ann. §§ 97-3-19(2)(e) and 97-3-73.

¶82. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED.**

**SMITH, C.J., WALLER, P.J., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. EASLEY, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, C.J., WALLER, P.J., CARLSON, DICKINSON AND RANDOLPH, JJ.. DIAZ, J., NOT PARTICIPATING.**

**EASLEY, JUSTICE, SPECIALLY CONCURRING:**

¶83.     I concur in the majority opinion.  However, I write separately to explain further why a mistrial was not required by the possibility that a juror may have briefly seen Spicer in shackles as he was transported into the courthouse for trial.

¶84.     In *Deck*, the United States Supreme Court held that "[t]he considerations that militate against the routine use of visible shackles during the guilt phase of a criminal trial apply with like force to penalty proceedings in capital cases." *Deck v. Missouri*, 125 S. Ct. 2007, 2013, 161 L. Ed.2d 953 (2005).[28]  Spicer was on trial for the brutal capital murder of Hebert by hacking the victim to death with a sword and stealing his vehicle.  Spicer also had a violent history with prior convictions for armed robbery, kidnaping, and attempted murder.

¶85.     In *Deck*, the defendant was shackled in the presence of the jury during the sentencing phase of the trial.  The Due Process Clause prohibits the routine use of physical restraints during the guilt phase of a trial.  *Deck*, 125 S. Ct. at 2010.  The issue in *Deck* was whether the routine use of physical restraints was also prohibited during the sentencing or penalty phase of a capital case.  *Id*. at 2012.

¶86.     The Court in *Deck* found that the record was "clear that the jury was aware of the shackles."  *Id*. at 2015.  That is not the situation in the case at bar.  The record does not even provide that anyone that served on the jury ever saw Spicer in any physical restraints. Further, here, the trial court conducted an on-the-record determination whether Spicer was prejudiced. Spicer was merely transported by a female deputy sheriff through the courtroom into a holding

---

[28]  Justice Thomas, joined by Justice Scalia, wrote in a dissenting opinion that the majority's decision "needlessly extends the rule from trials to sentencing" and "ignores the serious security issues facing our courts."  *Id*. at 2015.

55

room before court.[29] Spicer was *not* shackled during the sentencing phase. The deputy sheriff testified that there were people in the courtroom, but she could not say that any members of the venire panel or any jurors were in the courtroom at the time. According to the deputy, Spicer was only in the courtroom for a matter of seconds. This all occurred before the venire had been empaneled, a jury selected or court began. The trial court determined that Spicer had not been prejudiced.

¶87. In *Deck*, the Court concluded "that courts cannot *routinely* place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding." *Id*. at 2014 (emphasis added). The Court went on to state that "[t]he constitutional requirement, however, is not absolute." *Id*. at 2014-15. The trial court is permitted to exercise its discretion to allow use of physical restraints and to account for the special circumstances involved. *Id*. at 2015.

¶88. Here, we are not dealing with restraints worn during the sentencing phase or the guilt phase. The situation in this case involves the inadvertent use of restraints by a deputy sheriff

---

[29] Miss. Code Ann. § 19-25-69 provides in part: "The sheriff shall have charge of the courthouse and jail of his county, of the premises belonging thereto, and of the prisoners in said jail."

Miss. Code Ann. § 19-25-35 provides:

The sheriff shall be the executive officer of the circuit and chancery court of his county, and he shall attend all the sessions thereof with a sufficient number of deputies or bailiffs. He shall execute all orders and decrees of said courts directed to him to be executed. He shall take into his custody, and safely keep, in the jail of his county, all persons committed by order of either of said courts, or by any process issuing therefrom, or lawfully required to be held for appearance before either of them.

to transport Spicer to court. The Court addressed a similar situation in ***Lockett v. State***, 517 So. 2d 1317 (Miss. 1987), relying on ***Rush v. State***, 301 So. 2d 297, 300 (Miss. 1974). The Court stated:

> This Court has ruled on this very issue in one case, *see **Rush v. State***, 301 So. 2d 297, 300 (Miss. 1974), and discussed this issue without deciding it in another, *see **Hickson v. State***, 472 So. 2d 379, 383 (Miss. 1985). Regardless of whose version is correct in the instant case, it is apparent under Rush that this incident did not deprive Lockett of his right to a fair trial. In ***Rush***, the deputy sheriff brought the defendant into the courtroom in handcuffs in the presence of members of the special venire whereupon the handcuffs were immediately removed at the request of defendant's counsel. ***Rush***, 301 So. 2d at 300. Recognizing the common-law right of a person being tried for the commission of a crime to be free from all manner of shackles or bonds, this Court held:

> > ***However, the failure, through an oversight, to remove handcuffs from a prisoner for a short time or any technical violation of the rule prohibiting shackling, not prejudicial to him, is not ground for reversal.***

> ***Rush***, 301 So. 2d at 300.

> ***Here, at worst the defendant was ten feet in the courtroom for a few minutes. There is no evidence indicating that this incident occurred intentionally.*** Indeed, as in ***Rush***, when the handcuffs were noticed, they were immediately removed. Accordingly, under the rationale in ***Rush***, it does not appear that this incident deprived Lockett of his right to a fair trial.

***Lockett***, 517 So. 2d at 1329-30. *See also **Lockett v. Anderson**,* 230 F.3d 695 (5th Cir. 2000) (granting federal habeas corpus relief on other grounds).

¶89. The record does not establish that any juror actually saw Spicer in shackles for the brief moment that he was transported by the deputy sheriff to the holding room. Our precedents support affirmance of the trial court's denial of Spicer's motion for a mistrial.

57

**SMITH, C.J., WALLER, P.J., CARLSON, DICKINSON AND RANDOLPH, JJ., JOIN THIS OPINION.**

# APPENDIX

# DEATH CASES AFFIRMED BY THIS COURT

*Hodges v. State,* — So.2d — (Miss. 2005).

*Walker v. State,* — So. 2d — (Miss. 2005).

*Le v. State,* — So.2d — (Miss. 2005).

*Brown v. State,* 890 So. 2d 901 (Miss. 2004).

*Powers v. State* 883 So.2d 20 (Miss. 2004)

*Branch v. State,* 882 So.2d 36 (Miss. 2004).

*Scott v. State,* 878 So.2d 933 (Miss. 2004).

*Lynch v. State,* 877 So.2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So.2d 140 (Miss. 2004).

*Byrom v. State,* 863 So.2d 836 (Miss. 2003).

*Howell v. State,* 860 So.2d 704 (Miss. 2003).

*Howard v. State,* 853 So.2d 781 (Miss. 2003).

*Walker v. State,* 815 So.2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So.2d 934 (Miss. 2002).

*Stevens v. State,* 806 So.2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So.2d 241 (Miss. 2002).

*Knox v. State,* 805 So.2d 527 (Miss. 2002).

*Simmons v. State,* 805 So.2d 452 (Miss. 2002).

*Berry v. State,* 802 So.2d 1033 (Miss. 2001).

*Snow v. State,* 800 So.2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).        *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738(1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

**DEATH CASES AFFIRMED BY THIS COURT**

**(continued)**

*****Jones v. State**, 517 So. 2d 1295 (Miss. 1987)**, Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

**Wiley v. State**, 484 So. 2d 339 (Miss. 1986).

**Johnson v. State**, 477 So. 2d 196 (Miss. 1985).

**Gray v. State**, 472 So. 2d 409 (Miss. 1985).

**Cabello v. State**, 471 So. 2d 332 (Miss. 1985).

**Jordan v. State**, 464 So. 2d 475 (Miss. 1985).

**Wilcher v. State**, 455 So. 2d 727 (Miss. 1984).

**Billiot v. State**, 454 So. 2d 445 (Miss. 1984).

**Stringer v. State**, 454 So. 2d 468 (Miss. 1984).

**Dufour v. State**, 453 So. 2d 337 (Miss. 1984).

**Neal v. State**, 451 So. 2d 743 (Miss. 1984).

**Booker v. State**, 449 So. 2d 209 (Miss. 1984).

**Wilcher v. State**, 448 So. 2d 927 (Miss. 1984).

**Caldwell v. State**, 443 So. 2d 806 (Miss. 1983).

**Irving v. State**, 441 So. 2d 846 (Miss. 1983).

**Tokman v. State**, 435 So. 2d 664 (Miss. 1983).

**Leatherwood v. State**, 435 So. 2d 645 (Miss. 1983).

**Hill v. State**, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

   \* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

**DEATH CASES REVERSED AS TO GUILT PHASE**

**AND SENTENCE PHASE**

*Flowers v. State,* 842 So.2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT


*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# <u>ON SENTENCING PHASE ONLY</u>


*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). *  Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.